[No. 30709. Department Two. June 23, 1949.]

CLARK E. RATHKE, *Appellant*, v. A. W. ROBERTS *et al.*, *Respondents and Cross-appellants.*[1]

[1] Reported in 207 P. (2d) 716.

*Cheney & Hutchinson,* for appellant.

*J. P. Tonkoff* (of *Tonkoff & Holst*), for respondents and cross-appellants.

ROBINSON, J.—This action was brought to recover damages for an alleged breach of contract. In March, 1947, the plaintiff, Rathke, a sole trader doing business as Rathke and Company, was engaged in the business of furnishing refrigeration equipment. The defendants, A. W. Roberts and Chrystal Roberts, his wife, were engaged in the fruit business under the name of A. W. Roberts Fruit Company.

In order to develop the questions raised on appeal, it seems necessary to state the substance of the pleadings. It

is alleged in the complaint that, on the sixth day of March, 1947, the plaintiff and the defendant A. W. Roberts, for and on behalf of himself and the marital community composed of himself and wife, entered into a written contract whereby the plaintiff agreed to sell to the defendants, and install in their fruit warehouse, a refrigeration system, and the defendants agreed to purchase the equipment, and promised and agreed to pay the plaintiff, when the system should be installed, the agreed purchase price for the equipment and installation in the sum of $16,541.43, plus taxes.

It is further alleged that the contract provided that the purchasers would make an advance payment of $4,141.43 on demand, and that from time to time the plaintiff made frequent demands, both orally and in writing, for the advance payment; that the defendants not only failed and refused to pay the same or any part thereof, but no part thereof has ever been paid by the defendants.

It is further alleged that, on or about the first day of July, 1947, the defendants notified the plaintiff that they had repudiated the contract, and were contracting with one of the plaintiff's competitors for the installation of a refrigeration system in their warehouse.

It is further alleged that the plaintiff sustained damages by reason of the loss of the net profits which he would have made in the transaction if the defendants had performed their contract obligations.

Plaintiff prayed for recovery in the sum of $7,426.53, with interest from July 1, 1947, until paid, together with his costs and disbursements. Attached to the complaint as exhibit "A" is a copy of the alleged written contract, which reads as follows:

"Head Office Seattle Branch Office Portland, Ore.

"RATHKE AND COMPANY
Refrigeration
Domestic Export
Telephone: Main 4861
Colman Building
Seattle 4, Washington, U. S. A.

"QUOTATION

Date March 6, 1947
Estimate No. ............

"To A. W. Roberts Fruit Company
Selah, Washington

"Subject to terms, conditions, and specifications herein and on the back hereof enumerated, and upon acceptance hereon by you within ten days from above date we will —

"2 Only No. 538-13C Floor Type Blower Coils

"2 Only S.F.-25 Schnacke Four Cylinder Condensing Unit

"1 Only 20″ x 20′ Condenser and Receiver Combination

"2 Only 15-Ton Freon 12 Expansion Valves

"All necessary hand valves, controls, tubing and fittings for complete installation and fully automatic system.

"To be installed at Selah, Washington.

for a total amount of Sixteen thousand five hundred forty-one 43/100 $16541.43 Plus all applicable State and Federal Taxes and NOT including any electrical wiring or plumbing, or air ducts to be installed by purchaser.

"RATHKE AND COMPANY

"Date Accepted— By CLARK E. RATHKE (Signed)
March 6, 1947

"SHIP to—Selah, ACCEPTED:
Washington Buyer A. W. ROBERTS FRUIT COM-

"Deposit of $4141.43 PANY
to be made upon
demand. By A. W. ROBERTS (Signed)

"Credit Allowance—None A. W. ROBERTS

"Balance—$12,600.00 on conditional sales contract with interest at 6% on unpaid balance; $500.00 plus interest ea. mo., Oct., Nov., Dec. 1947, Jan. Feb. March 1948, then $1000 ea. mo. plus interest Oct., Nov., Dec. 1948, Jan., Feb. 1949, Balance $4600. and interest March 1949."

The conditions on the back thereof read, in part, as follows:

"TERMS AND CONDITIONS

"It is mutually agreed between the Purchaser and the Rathke and Company, hereinafter referred to as the Company, that:

"1. *This proposal is for acceptance by the Purchaser within 10 days from the date appearing on the face hereof and shall constitute a valid and binding agreement between the parties hereto.*

"2. Should the completion of the work be interrupted or delayed for sixty days or more for any cause not attributed to the Company, payments for all labor supplied and all materials furnished or installed shall become immediately due and payable.

"3. The title to and right to possession of all materials delivered whether stored, erected or in course of erection, shall remain in the Company until the same shall have been fully paid for. The right of the Company to file a Mechanic's Lien or other Lien for labor and materials furnished and supplied, is hereby expressly reserved and the Purchaser hereby waives any other or further notice of intention to file such lien. Should the Purchaser default in any of the terms or conditions of this agreement or be adjudged bankrupt or make an assignment for the benefit of creditors or become insolvent, the whole of the unpaid purchase price hereunder shall immediately become due and payable and the Company may take any and all necessary steps to enforce and collect payment thereof. . . .

"7. *The Purchaser shall notify the Company in advance when the premises will be ready for the installation*; shall at all times give free and unobstructed access to the place where the work is to be done; shall put and keep all areas in which work is being done in a condition satisfactory to the Company, so that the work to be done under this agreement can be started promptly and completed without delay.

"8. The Company shall not be liable for damages or otherwise for any delay in the performance or completion of the work hereunder caused by labor strikes, lockouts, fire, accidents, lack of raw materials, Acts of Government, unavoidable casualties, orders of any court or other public authority or other causes beyond its control." (All italics in the foregoing quotation are ours.)

In its answer, the defendant fruit company denied it made such a contract, as well as substantially all the other ma-

terial allegations of the complaint. It also set up the following affirmative defense:

"That if the defendant, A. W. Roberts agreed to purchase any machinery from the plaintiff, the plaintiff agreed to install said machinery on or before July 30, but that the said plaintiff failed and neglected and abandoned his agreement, *if any*, to install any machinery or equipment in the defendants' warehouse situated at Selah, Washington." (Italics ours.)

To the above affirmative defense, the plaintiff replied:

"Plaintiff denies each and every allegation contained in the affirmative defense therein, and alleges that the delay in the installation of said machinery was due to the failure of the defendants to pay to the plaintiff a down payment on the purchase price thereof; that plaintiff made repeated demands upon the defendants for such payment, but the defendants failed and refused to pay any part of said purchase price."

The cause came on for jury trial in February, 1948. The jury returned a verdict in favor of the plaintiff for seven hundred fifty dollars. The plaintiff moved the court, notwithstanding the verdict, for the entry of a judgment in his favor in the sum of $6,800, and, in the alternative, for a new trial. The defendants, alleging that there was no evidence of any legal damage whatever, moved that the verdict be set aside and the cause dismissed.

The post trial motions of both parties were denied. The plaintiff appeals, and prays this court to either order the trial court to enter a judgment in his favor for $6,800 or grant a new trial. The defendants cross-appeal, and pray that the trial court be ordered to cancel the judgment appealed from and dismiss the action.

Before specifically discussing the assignments of error made by the respective parties, it seems desirable to state that the major controversy between the parties relates to the rule of damages to be applied in such a case as this. The appellant contends that the legal measure of his damages is the amount of profit he would have made if the defendants had performed their contract obligations. On this theory,

plaintiff introduced evidence of the cost of the machinery described in the contract, and offered evidence as to the amount it would have cost him to install it in the warehouse, and so forth, and, on appeal, he asserts, and we think rightly, that all of these amounts were conclusively proven at the trial.

No evidence, other than the contract itself, was necessary for the jury to determine what amount he would have received for the performance of the contract if the respondents had not repudiated it. By its terms, the appellant was to furnish and install the machinery, and the cross-appellants, on their part, were to pay him $16,541.43. Appellant contends that that amount, less his cost of performance, was the proper formula for ascertaining his legal damage. The cross-appellants, however, contend that this is not so because the appellant still had the machinery at the time of trial, and could sell it at a profit. They also contend that, when they canceled the contract, it was within the appellant's power to avoid damages, or at least to mitigate damages, by selling the machinery to others.

The cross-appellants also insist that, assuming that there was a valid contract, the rule of damages to be applied is fixed by the case of *Fosseen & Co. v. Kennewick Supply & Storage Co.*, 144 Wash. 67, 256 Pac. 779, which was concerned with the breach of a contract of sale of a commodity (arsenate of lead).

The appellant also relies, in part, upon a portion of the uniform sales act. Rem. Rev. Stat., § 5836-64 [P.P.C. § 858-7].

The contract in this case is not one of sale of a commodity; it was a contract for much more than that. It was a contract by which the appellant was bound to install a certain type of refrigeration system in the cross-appellants' warehouse, as is quite clearly shown by the written instrument executed by the parties, hereinbefore quoted, and especially by the terms and conditions appearing on the reverse of the instrument, and by the recital on the first page signed by the parties and made a part thereof. Although it is not cited

in the appellant's brief, we think his position is strongly supported by the following statement in McCormick on Damages 560, § 137:

"The primary aim in measuring damages is compensation, and this contemplates that the damages for a tort should place the injured person as nearly as possible in the condition he would have occupied if the wrong had not occurred, and that the damages for breach of contract should place the plaintiff in the position he would be in if the contract had been fulfilled.

"Occasionally in tort cases an award by way of punishment may be made, but normally in all kinds of cases the truism remains true that the primary aim in measuring damages is to arrive at *compensation,* no more and no less. In a case of tort—the breach of some duty which the law imposes on every one—the general purpose of compensation is to give a sum of money to the person wronged which, as nearly as possible, will restore him to the position he would be in if the wrong had not been committed. *In the case of a breach of contract, the goal of compensation is not the mere restoration to a former position, as in tort, but the awarding of a sum which is the equivalent of performance of the bargain—the attempt to place the plaintiff in the position he would be in if the contract had been fulfilled."* (Italics ours.)

That is the only thing the plaintiff sought and prayed for in this case.

In the article on damages in 15 Am. Jur. 442, § 43, under the subtitle "Breach of Contract," it is said, in part:

"In accordance with the general principle governing the allowance of damages, a party to a contract who is injured by its breach is entitled to compensation for the injury sustained and is entitled to be placed, in so far as this can be done by money, in the same position he would have occupied if the contract had been performed. Moreover, his recovery is limited to the loss he has actually suffered by reason of the breach; he is not entitled to be placed in a better position than he would have been in if the contract had not been broken. Otherwise stated, the measure of damages is the actual loss sustained by reason of the breach, which is the loss of what the contractee would have had if the contract had been performed, less the proper deductions.

Another statement of the rule is that the measure of damages for the breach of a contract is the amount which would have been received if the contract had been kept, which means the value of the contract, including the profits and advantages which are its direct results and fruits."

In the article on damages in 25 C. J. S. 519, § 43, it is said, in part:

"As a general rule a party not in default is, in case of a breach of contract due to the fault or omission of the other party, entitled to recover profits which would have resulted to. him from performance; but in order that it may be a recoverable element of damages the loss of profits must be the natural and proximate result of the breach complained of and they must be capable of ascertainment with reasonable certainty. Lost profits are recoverable only when it reasonably appears that they would have been made if the contract had been performed, and that their loss necessarily followed the breach. A recovery of speculative or conjectural profits will be denied. Reasonable certainty of proof is, however, sufficient to satisfy the requirement of this rule."

It is said, in the opinion of the supreme court of the United States in *Miller v. Robertson*, 266 U. S. 243, 257, 69 L. Ed. 265, 45 S. Ct. 73:

"Compensation is a fundamental principle of damages, whether the action is in contract or in tort. *Wicker v. Hoppock*, 6 Wall. 94, 99. One who fails to perform his contract is justly bound to make good all damages that accrue naturally from the breach; and the other party is entitled to be put in as good a position pecuniarily as he would have been by performance of the contract. *Curtis v. Innerarity*, 6 How. 146, 154."

The principles above stated were fully recognized by this court, as early as 1906, in *Federal Iron & Brass Bed Co. v. Hock*, 42, Wash. 668, 670, 85 Pac. 418, as follows:

"Ofttimes in the breach of a contract of this character, the only damages sustained are those of future profits. These may be of a substantial character in contemplation of law, and such as the injured party should be entitled to recover from the party who has without justification broken the contract. The recovery must, of course, be limited to

the amount which from all surrounding conditions may be deemed to have been reasonably certain had the breach not occurred. In the case of *Wakeman v. Wheeler & Wilson Mfg. Co.*, 101 N. Y. 205, 4 N. E. 264, 54 Am. Rep. 676, the court of appeals of New York said:

" 'Most contracts are entered into with the view to future profits, and such profits are in the contemplation of the parties, and so far as they can be properly proved, they may form the measure of damage. As they are prospective they must, to some extent, be uncertain and problematical, and yet on that account a person complaining of breach of contract is not to be deprived of all remedy. It is usually his right to prove the nature of his contract, the circumstances surrounding and following its breach, and the consequences naturally and plainly traceable to it, and then it is for the jury, under proper instructions as to the rules of damages, to determine the compensation to be awarded for the breach.'

"See, also, *Skagit R. & Lum. Co. v. Cole*, 2 Wash. 57, 25 Pac. 1077; *Shepard v. Milwaukee Gas Light Co.*, 15 Wis. 349; *Goldhammer v. Dyer*, 7 Colo. App. 29, 42 Pac. 177."

The cross-appellants' position as to the applicable rule of damages is shown by their assignment that the trial judge erred in not granting their request to include the following language in his instructions to the jury:

"If the plaintiff is entitled to recover at all, his measure of damages will be the difference between the price which the defendant ·agreed to pay for the goods under the instrument of March 6, and their market value at the time and place agreed upon for delivery and acceptance by the defendant."

In support of this assignment, the cross-appellants say, among other things:

"The rule in this state has been firmly established and followed that the measure of ·damages for a buyer's refusal to accept goods purchased, is the difference between the contract price and the market value at the time of the breach."

■ We again call attention to the fact that the contract in suit is not an ordinary contract for the purchase and sale of goods but a contract which obligated the plaintiff to install a certain type of refrigeration system in the defend-

ants' warehouse; the plaintiff to furnish the required machinery. In return for the installation of the operative refrigeration system, the defendants expressly obligated themselves to pay the plaintiff $16,541.43 plus all applicable state and Federal taxes.

Under the authorities above cited and quoted, and particularly under the decision in *Miller v. Robertson,* 266 U. S. 243, 257, 69 L. Ed. 265, 45 S. Ct. 73, the plaintiff was entitled "to be put in as good a position pecuniarily as he would have been by performance of the contract"; that is to say, he was entitled to his profit in the whole transaction, that is, the installation of a complete and operative refrigeration system in the defendants' fruit warehouse. It is perfectly clear that he was to receive the $16,541.43 for the completed installation of the refrigeration system in the warehouse, not merely for furnishing the machinery listed in the contract.

It is our opinion that the trial judge did not err in refusing to instruct the jury as to the measure of damages as requested by the defendants, but he would have erred had he done so.

Among the assignments of error made by the cross-appellants is one that the court erred in refusing a portion of one of their proposed instructions which read as follows:

"You are instructed to bring in a verdict against the plaintiff and in favor of the defendants."

In support of this assignment, it is said, in the cross-appellants' brief, that the rejected instruction was based on the ground "that the plaintiff has failed to show any damages, damages being the difference between the contract price and the market value at the time and place of delivery." Such an instruction would have limited the plaintiff to partial damages only; whereas his action was brought and tried on the theory supported by the text writers quoted earlier in the opinion, and perhaps best expressed by the supreme court of the United States in its opinion in *Miller v. Robertson, supra:*

"One who fails to perform his contract is justly bound to make good all damages that accrue naturally from the breach; and the other party is entitled to be. put in as good a position pecuniarily as he would have been by performance of the contract."

The cross-appellants, while admitting that they flatly repudiated the contract on July 1, charged the plaintiff with having been guilty of a prior breach. It is said, in their brief:

"That defendant has wholly and totally failed to perform under the agreement, because by reason of said agreement, which was prepared by the plaintiff, he failed to conform to said agreement in not having shipped the property within 10 days of March 6, 1947, and therefore could not possibly recover."

This contention requires a further analysis of the contract (exhibit No. 2), hereinbefore quoted. The first page thereof is in the form of a "Quotation" by Rathke and Company, dated March 6, 1947, and addressed to "A. W. Roberts Fruit Company, Selah, Washington." It is first said:

"Subject to terms, conditions, and specifications herein and on the back hereof enumerated, and upon acceptance hereon by you within ten days from above date we will—"

This is followed by a listing of certain articles of machinery to be installed at Selah, Washington, for a total amount of $16,541.43. The proposal is executed by Rathke and Company, and accepted by "Buyer A. W. Roberts Fruit Company, by A. W. Roberts." The bottom of the page reads as follows:

"Date Accepted March 6, 1947
"Ship to Selah, Washington
"Deposit of $4141.43 to be made upon demand
"Credit Allowance None
"Balance, $12,600.00 on conditional sales contract with interest at 6% on unpaid balance; $500.00 plus interest ea. mo., Oct., Nov., Dec., 1947, Jan., Feb., March, 1948, then $1000. ea. mo. plus interest Oct., Nov., Dec. 1948, Jan., Feb. 1949, Balance $4600. and interest March 1949."

The cross-appellants' first assignment of error reads as follows:

"The Court erred in overruling defendant's demurrer."

They urge, in support of that assignment, that:

"If the plaintiff relies on recovery upon Ex. 2, then upon the face of his complaint he cannot recover, because he alleges that he did not perform according to the terms and conditions he imposed upon himself by the execution of the agreement in that he failed to deliver the goods mentioned in Ex. 2, within 10 days of the acceptance of the offer by the defendant. Consequently, the demurrer to plaintiff's complaint interposed prior to trial should have been sustained."

Their position is further shown by the fact that they later assigned that the trial court erred in not giving the following instructions proposed by them:

"If you find from a preponderance of the evidence and the instrument dated March 6, 1947, that the plaintiff was required to ship said goods to the defendant within 10 days from the execution of said instrument, then it is your duty to bring in a verdict in favor of the defendants.

"You are instructed that if you find by a preponderance of the evidence that the plaintiff was required to deliver the goods which are the subject matter of this litigation within 10 days of March 6, 1947, then I instruct you that the defendant was not required to pay to plaintiff the sum of $4,141.43, then your verdict should be in favor of the defendants."

In our opinion, the written instrument (exhibit No. 2) is not subject to any such construction as the cross-appellants attempt to give it. In the first place, as we have several times noted, it is unrealistic to say that the goods listed on the first page of exhibit No. 2 are the subject matter of the litigation. Exhibit No. 2 is a contract, not merely to deliver goods but one in which the plaintiff obligated himself to install a refrigeration system in the warehouse of cross-appellants at Selah, he not only to furnish certain of the machinery required, but to install it, and the cross-appellants to pay him, when installed, $16,541.43, in the following manner:

"Date Accepted March 6, 1947
"Ship to Selah, Washington
"Deposit of $4141.43 to be made upon demand
"Credit Allowance None

"Balance, $12,600.00 on conditional sales contract with interest at 6% on unpaid balance; $500.00 plus interest ea. mo., Oct., Nov., Dec., 1947, Jan., Feb., March, 1948, then $1000. ea. mo. plus interest Oct., Nov., Dec. 1948, Jan., Feb. 1949, Balance $4600. and interest March 1949."

We find nothing in exhibit No. 2 by which the plaintiff obligated himself to deliver the machinery listed therein at Selah, Washington, within ten days of the execution of the instrument. The cross-appellants base their contention, that the contract (exhibit No. 2) bound the plaintiff to deliver the machinery at Selah within ten days after March 6, 1947, on the following language found on the first page of the instrument:

"Date Accepted March 6, 1947
"Ship to Selah, Washington
"Deposit of $4141.43 to be made upon demand."

But the initial statement on the quotation so accepted read as follows:

"Subject to terms, conditions, and specifications herein and on the back hereof enumerated, and upon acceptance hereon by you within ten days from above date we will—"

We find, on the reverse of the proposed quotation, under the heading, "Terms and Conditions," sixteen paragraphs most of which deal with the installation of the refrigeration system. No. 1, which is very pertinent to our present inquiry, reads as follows:

"This proposal is for acceptance by the Purchaser within 10 days from the date appearing on the face hereof and shall constitute a valid and binding agreement between the parties hereto."

We have above quoted the only reference to "10 days" that we find in the instrument. In our opinion, the first of these, on the face of the contract, merely provides nothing more than the proposal tendered on March 6th could be open to the Roberts Fruit Company for acceptance for ten days, and the second, on the reverse side, merely provides that, if accepted within ten days, the instrument would constitute "a valid and binding agreement" between the parties.

■ The cross-appellants did so accept it; it did become a binding agreement, and, among other things, the defendants therein agreed to make a deposit of $4,141.43 on demand. It was shown, in presenting the plaintiff's case, and it was admitted by the cross-appellants, that demand was made upon them for the deposit, both orally by telephone and in several letters, and that no part of the amount was ever paid.

Rathke testified that he first demanded the deposit of $4,141.43 by telephone in April, 1947. Roberts admitted, on the witness stand, that the deposit was demanded by telephone on several occasions. He also admitted that several such demands were made in writing; in fact, he had with him in court copies of originals of a number of such letters some of which were introduced as exhibits in the case during his cross-examination. One is a copy of a letter dated May 7, 1947. Another is an original letter of May 29, 1947, and reads as follows:

"Dear Mr. Roberts:

"We must have a letter from your sponsor advising us that the deposit money on your equipment will be available some definite day in June. Without this, we cannot order your equipment shipped, and incidentally, the blowers must be manufactured specially.

"Unless we can have this letter, or deposit, do not blame us if there should be any delays in the delivery of the equipment required for your plant.

"Yours very truly,<br>"RATHKE AND COMPANY<br>By Clark E. Rathke"

Another of the letters brought into court by Mr. Roberts, dated June 12, 1947, was received in evidence without objection and reads as follows:

"Dear Mr. Roberts:

"We must have a letter immediately from your mortgage company confirming the fact that they are going to make you the loan that you have asked for so that we can confirm shipping instructions on the equipment necessary for your plant.

"Without your deposit or something definite, we cannot issue these instructions. The matter is urgent. Please comply.

"Yours very truly,

"RATHKE AND COMPANY

"By Clark E. Rathke."

Another original of June 20, 1947, was, without objection by the defendants, introduced in evidence. This letter was addressed to Mr. A. W. Roberts, Selah, Washington, and signed by Rathke and Company by Clark E. Rathke. After expressing some doubts as to Mr. Roberts' financial situation, the letter closes as follows:

"The point is that some of this is custom built equipment for your specific requirements—that is the blower. The manufacturer wants a deposit from us and unless you can send in the amount called for as down payment, we cannot and will not place the order for this equipment and any further delays are going to be a hazard to your operations.

"We can get delivery of the compressor in two or three weeks but this is not true of the blower, so it is entirely up to you to get this money in immediately to protect your deal."

No portion of the stipulated deposit of $4,141.43 was ever paid to plaintiff by the defendants. In this connection, the contract was repeatedly breached by the defendants, and finally entirely repudiated. We quote briefly from testimony given by Mr. Roberts:

"Q. Mr. Roberts, did you purchase this equipment for your warehouse elsewhere? A. Yes, sir. Q. You purchased it from what company? A. Reynolds Refrigeration Company. Q. And it is a Seattle company that is in the same business and is a competitor of Rathke and Company? A. Yes, sir. Q. And I believe it was approximately the 1st of July that you had your attorney, at that time Mr. Tunstall, I believe, write a letter to that effect to Mr. Rathke, that you weren't going through with this contract but that you were purchasing it from someone else? A. Yes."

The letter mentioned in the foregoing quotation was duly received by the plaintiff. Mr. Rathke testified concerning it as follows:

874

"Q. What was the reason, Mr. Rathke, that you did not actually deliver and install any of this equipment at the Selah warehouse? . . . I received a letter from Mr. Roberts' attorney notifying us that he was cancelling his contract and would not accept delivery. Q. And what month was that? A. That was in July, 1947. Q. Around the 1st of July, was it? A. Yes. Q. And up to that time, assuming that this $4100 down payment were made, my question is: state whether or not you were ready, able, and willing to perform the contract and deliver and install the equipment. A. We were. Q. Will you just go ahead and tell us just what you had done with reference to getting this equipment available. A. We had ordered the equipment that was required for installation, and according to the contract, and some of it was shipped in June, and some of it we were able to cancel after Mr. Roberts notified us of cancellation. Q. Could you specify what it was that was shipped in June? A. Two compressors and one of the receiving tanks. The blower was held up. . . . Q. The blower wasn't delivered at that time? A. No. Q. What was the situation as to availability of the blower? A. The order had been placed and it was on file and, as far as we knew, it was available. We had had no notification it couldn't be shipped. We had placed the order for shipment around July 1st. Q. Do you mean you had placed the order around July 1st or— A. No, we placed the order for the equipment to be shipped approximately July 1st. Q. Approximately when did you place the order for the blower? A. Well, I don't know. It was quite some time previous to—I think it was in May. Q. With reference to these parts of the equipment that you say were delivered, where were they delivered? A. It was ordered shipped to Selah, and we were able to stop some of the equipment at Spokane; we held it there for a long time. Then it came into Seattle; we diverted it into Seattle. Q. That is, after you received this message from Mr. Roberts' attorney, you stopped shipment at Spokane? A. Yes."

We find no merit in any of the cross-appellants' assignments of error.

It remains to consider the plaintiff's appeal. His assignments of error are as follows:

"The trial court erred:

"1. In denying plaintiff's motion for entry of judgment in his favor in the sum of at least $6800.00, notwithstanding the verdict.

"2. In denying plaintiff's motion for new trial.
"3. In entering judgment in favor of plaintiff for only $750.00.
"4. In giving to the jury instruction No. 4.
"5. In giving to the jury instruction No. 5.
"6. In giving to the jury instruction No. 6."

We will first consider the assignments with reference to the instructions given to the jury. Instruction No. 4, as given to the jury, read as follows:

"If you find from a preponderance of the evidence that the plaintiff and defendant entered into the contract as alleged, and that plaintiff performed all of the terms and conditions of said contract by him to be performed, and that on or about the 1st day of July, 1947, the defendants notified the plaintiff that they repudiated said contract and refused to comply therewith, then your verdict will be in favor of the plaintiff.

"If, on the other hand, you find that the plaintiff failed and neglected and abandoned his agreement, if any, then your verdict will be for the defendants."

To the foregoing instruction plaintiff's attorney seasonably took the following exception:

"Plaintiff excepts to Instruction No. 4, and particularly to the following portions thereof, as given by the court to the jury. Plaintiff excepts to the clause 'and that plaintiff performed all of the terms and conditions of said contract by him to be performed,' for the reason that there should have been added thereto the words 'prior to July 1, 1947,' in other words, that being the date of the admitted repudiation of the contract by the defendant under the undisputed evidence, and of course there would be no obligation on the plaintiff to further perform after that date, and the obligation of making actual delivery and installation of course admittedly would not have arisen until after that date, during the month of July, at least, said language being confusing to the jury in that respect and easily subject to being misunderstood by them so as to require actual delivery or installation by the plaintiff, which is not correct.

"Plaintiff excepts to the last paragraph of Instruction No. 4, for the reason that there is no evidence in the case which would furnish a basis for such statement. In other words, there is no testimony that the plaintiff either failed or neglected to perform his obligations under said agree-

ment nor that the plaintiff ever abandoned the agreement, other than the natural abandonment of a further performance after the defendant repudiated the same. Consequently, it was error to give said instruction because there is no evidence as a basis therefor."

In our opinion, this exception was well taken. It is said, in the opinion in *Neeley v. Bock*, 184 Wash. 135, 142, 50 P. (2d) 524:

"It is the settled rule in this jurisdiction that it is prejudicial error to submit to the jury a question where there was no substantial testimony upon which to base the instruction. [Citing cases.]

"There being no evidence from which the jury could conclude that the truck was parked or left standing, within the contemplation of the statute, it was prejudicial error to submit that question to the jury.

"The judgment will be reversed and the cause remanded, with direction to the superior court to grant a new trial."

 Instruction No. 5, as given to the jury, read as follows:

"You are instructed that the plaintiff, Clark E. Rathke, caused to be prepared the instrument dated March 6th. In this connection I instruct you that if there is, by a preponderance of the evidence, an ambiguity in the terms or conditions of said instrument, in other words, if said instrument can be interpreted one way as well as another, it is your duty to construe said instrument in a light most favorable to the defendant, A. W. Roberts."

To that instruction the plaintiff interposed the following exception:

"Plaintiff excepts to Instruction No. 5 given by the court, with reference to ambiguity, for the reason that as a matter of law there is no ambiguity in this contract, Exhibit 2, and consequently that legal principle clearly has no application to this case. The only ambiguity contended for by the defendant is as to the 10-day provision, and very clearly the same was a provision for acceptance of the offer by the defendant, and the contract does not contain any provision requiring delivery and installation within ten days by the plaintiff of the equipment, which of course would have been an impossibility under the undisputed evidence that

at least a portion thereof had to be specially manufactured at Minneapolis, Minnesota."

Again, we agree that the exception was well taken. The record shows, as the plaintiff pointed out in his exception, that the only ambiguity contended for by the defendants was as to the ten-day provision.

As we have hitherto pointed out, the very first words in the quotation which was made by the plaintiff and accepted in writing by the defendants, were the following:

"Subject to terms, conditions, and specifications herein and on the back hereof enumerated, and upon acceptance hereon by you within ten days from above date we will—"

and the very first of the terms and conditions "on the back hereof enumerated" is as follows:

"1. This proposal is for acceptance by the Purchaser within 10 days from the date appearing on the face hereof and shall constitute a valid and binding agreement between the parties hereto."

There are no other "ten days" or "10 days" mentioned anywhere else in the instrument. The defendants stoutly contended throughout the trial that the contract required the plaintiff to deliver the machinery listed on its face within ten days of March 6, 1947, the date the offer on the first page of the instrument (exhibit No. 2) was accepted, or at least that is a permissive construction of the written instrument, and it is therefore ambiguous. Clearly, that is not a permissive construction of the ten-day provisions. Where the "ten days" is first used at the very beginning of the offer made on the first page of the instrument, it simply says: This offer will be held open for your acceptance for a period of ten days, and when "10 days" is next used in the first condition on the back of the offer, it simply provides that, if accepted within ten days from the date appearing on the face of the instrument, it "shall constitute a valid and binding agreement between the parties." In no way can the contract be construed to contain any provision requiring delivery and installation of the equipment by the plaintiff within ten days.

The vice of instruction No. 5 is that, under the circumstances, it invited the jury to make such a construction. That may be the reason, or one of the reasons, why the jury awarded the plaintiff such an inadequate amount.

Appellant also contends that the court erred in giving instruction No. 6, which read as follows:

"You are instructed that where the buyer wrongfully neglects or refuses to accept and pay for goods, the measure of damages is the estimated loss directly and naturally resulting in the ordinary course of events from the buyer's breach of contract. You are also instructed that where there is an available market for the goods in question, the measure of damages is, in the absence of special circumstances showing proximate damages of a greater amount, the difference between the contract price and the market or current price at the time when the goods ought to have been accepted. You are further instructed that where there is a market, it is the duty of the aggrieved party to practice diligence to the end that the loss may be as small as possible. This rule is predicated upon the principle that damages are allowed as compensation for actual monetary loss, and if the seller can find a market equal or better than that provided in his contract, there is no loss to compensate. You are further instructed that profits are allowed by way of compensation where there is no market price, or the commodity is manufactured to meet some purpose leading away from rather than into the market.

"So in the case at bar, if you find that the plaintiff is entitled to recover under the evidence and these instructions, then it will be your duty to consider the question of damages; but I simply instruct you on that point for information in case it becomes necessary for you to determine that question in your deliberations.

"If you find that the plaintiff is entitled to recover in this action under these instructions, and if you further find from the evidence that there was an available market for the goods in question, then and in that event I instruct you that the measure of damages to be applied by you will be the difference between the price which the defendant agreed to pay for the goods under the instrument of March 6th and their market value at the time and place agreed upon for delivery and acceptance by the defendant. However, if you find that there was no market price for the goods in question at the time the goods should have been

accepted under the contract, then and in that event I instruct you that the measure of damages, if any, to apply to the facts in this case, will be the net profits, if any, which would have accrued to the plaintiff if the contract had been performed."

To that instruction the plaintiff took a seasonable exception, as follows:

"Plaintiff excepts to Instruction No. 6 as given by the court, for the reason that the same is confusing to the jury and does not state the correct measure of damages in this case. It is our contention that the jury should have been instructed in a few brief words that if they found in favor of the plaintiff the measure of damages is and would be the net profits which the plaintiff would have sustained or would have received if this contract had been performed by the defendant. It is our contention that that is the proper rule of law to be applied under these circumstances, and that otherwise the plaintiff dealer in a situation of this kind would simply not have any right to recover damages at all, in view of the fact that the retail selling market price and the contract price in this situation were one and the same figure, and the jury would naturally infer from this instruction that, when the term 'market value' is used, that refers to the same figure as the contract selling price of this equipment, and consequently the jury should not apply here the rule of law stated in the Utah case of Stewart v. Hanson, 44 A. L. R. 340, which is cited with approval by the Washington Supreme Court in Stevenson v. Puget Sound Vegetable Growers Association, 172 Wash. 196, and other cases which we cited to Your Honor in the argument on Saturday in support of our contention.

"It is further our contention that this instruction was erroneous for the reason that under the undisputed evidence herein there was not an available market for resale of this equipment, and consequently the jury should not have been given any instruction referring to the difference between contract price and market price or market value, but only a brief instruction that the measure of damages is the loss of net profits which would have accrued to the plaintiff if the contract had been performed."

■ While we do not agree with all that is said in the foregoing exception, we do agree that the instruction was confusing, and also agree with this portion thereof:

"It is our contention that the jury should have been instructed in a few brief words that if they found in favor of the plaintiff the measure of damages is and would be the net profits which the plaintiff would have sustained or would have received if this contract had been performed by the defendant."

As we have noted earlier in this opinion, the appellant's case was pleaded on that theory, and that was the exact recovery he prayed for. In connection with that point, we cited, earlier in the opinion, a number of decisions applying that rule of damage in actions for breach of contract, and quoted from a number of texts. We do not think additional citations are necessary. The rule invoked by the appellant is a simple one and, if given in the words used by the supreme court of the United States in *Miller v. Robertson*, 266 U. S. 243, 257, 69 L. Ed. 265, 45 S. Ct. 73, would be easily understood by a jury:

"One who fails to perform his contract is justly bound to make good all damages that accrue naturally from the breach; and the other party is entitled to be put in as good a position pecuniarily as he would have been by performance of the contract."

Moreover, it would have been easy of application in the instant case, since the evidence establishes, beyond any question, that the defendants repeatedly refused to make a deposit on demand, as required by the contract, and finally repudiated the contract altogether; and the evidence further shows, in detail and without dispute, the amount it would have cost the plaintiff to have procured the machinery listed in the contract and properly installed it in the warehouse of the defendants. To find the amount of plaintiff's damages, it was only necessary to subtract the plaintiff's cost of performance from $16,541.43.

■ It is true that, at the time of trial, the appellant still had the machinery involved in this action, and it is contended that, when the defendants wholly repudiated the contract, the plaintiff might have mitigated his damages by selling it to someone else. But there is no evidence whatever that he could have made a contract to install that

machinery in the warehouse of some other person for $16,-541.43, or any other sum. On the other hand, there is ample evidence indicating that he probably could not have done so, for several reasons: In the first place, he was not free to look for another customer until the defendants repudiated the contract about July 1st. Moreover, the equipment was of such size and power as to restrict his probable sale to persons desiring to refrigerate large fruit warehouses, and it was rather late in the season for that. Furthermore, the refrigeration system involved in the contract was the Freon system, and there is ample evidence in the record to the effect that that system was not thought to be as desirable for warehouse refrigeration as the ammonia system.

Early in July, the defendants canceled their contract with the plaintiff and contracted with G. J. Reynolds for the refrigeration of their warehouse. Mr. Reynolds was called as a witness by the defendants, and, after explaining that he manufactured, sold, and installed industrial equipment in fruit warehouses, testified, in part, as follows:

"Q. Do you handle Freon refrigeration equipment? A. Very rarely. Q. I believe you stated that ordinarily you handle ammonia equipment? A. Right. Q. Some purchasers prefer one, and some the other, don't they? A. If they are not familiar with the refrigeration equipment they may buy what is recommended. If they are an experienced operator, very few will buy Freon for warehouses. Q. Very few will buy Freon for warehouses? A. Right. Q. In other words, you would say, then, that there would be relatively few customers to purchase this particular Freon equipment? A. To put it in an apple warehouse, yes; air conditioning, no, or any other warehouse using a 25-horse-power or 25-ton compressor that's used every day. Q. Well, you started out by saying 'an apple warehouse, yes.' Just what do you mean by that? A. I mean that 95% of the refrigeration men will not try to sell Freon to take care of fruit or a large warehouse, but that same salesman may go out and sell a Freon job to air conditioning, a store, a restaurant, a drugstore, a fishing vessel, or in the apples that's more or less used in."

And further testified, on cross-examination, as follows:

"Q. But the average concern in the fruit warehouse

business would not be interested in buying this equipment, then? A. Not necessarily in the fruit, no. Q. They would not be interested? A. Right."

We are of the opinion that the verdict of the jury in this cause was grossly inadequate and that the evidence in the case would have sustained a verdict of considerably more than $6,800. However, it is not our province to act as a jury in the matter, especially at this stage of the proceedings, and we are loth to establish such a precedent. But we are also of the opinion that there were several errors in the trial court's instructions which were prejudicial to the plaintiff.

In view of all the facts and circumstances, we feel that the fairest disposition we can make of this appeal and cross-appeal is to remand the cause to the superior court of Yakima county, with direction to grant the appellant a new trial. It is so ordered.

MALLERY and HILL, JJ., concur.

SIMPSON, J., concurs in the result.

SCHWELLENBACH, J. (concurring in the result)—I agree that instruction No. 6 was confusing. However, I am of the opinion that it is the duty of a party to a contract which has been breached, to mitigate his damages, if possible. I therefore concur in the result.