[No. 945-3. Division Three. July 1, 1975.]

ROBERT CARLSON et al, *Appellants*, v. LEONARDO TRUCK LINES, INC., et al, *Respondents*.

*Robert H. Stevenson,* for appellants.

*James S. Scott, Smith & Scott, C. James Lust,* and *Velikanje, Moore, Shore & Lust,* for respondents.

WILLIS, J.*—In late 1970, the defendant Leonardo Truck Lines, Inc. (hereafter "L.T.L."), a trucking concern possessing both interstate and intrastate permits, was in dire financial straits, having a total indebtedness of approximately $250,000 and being pressed for payment by a number of its creditors. Its stock was owned principally by John Leonardo and D. A. Leonardo, with Ernie Marang as

---

*Judge Robert J. Willis is serving as a judge pro tempore of the Court of Appeals pursuant to the Laws of 1973, ch. 114.

a minority stockholder. It had not been able to make expenses in the ordinary course of business for at least 3 years, and its owners had been attempting its sale for about 2 years.

On December 19, 1970, D. A. and John Leonardo entered into a written agreement with Robert Hofmann and plaintiffs Robert Carlson and Ralph Huber to sell them all the stock of L.T.L. for $400,000, the agreement reciting that the Leonardos were acting "on behalf of themselves and all stockholders of Leonardo Truck Lines, Inc." The agreement provided that an initial payment of $200,000 should be made from the proceeds of a Small Business Administration (hereafter "SBA") loan, to be applied for by the purchasers. Further, the loan was to be obtained on or before March 31, 1971, and the balance of the purchase price was to be paid at the rate of $10,000 per year, plus interest.

Shortly thereafter, the plaintiffs and Mr. Hofmann (hereafter "purchasers") engaged a Seattle attorney to assist them in making application for an SBA loan. It was agreed by the parties that before SBA would act favorably upon such a loan application it would have to be furnished with certain financial information concerning the L.T.L. corporation, including a year-end financial statement and a CPA audit.

The parties are in disagreement as to whether the purchasers were frustrated in their attempts to obtain from the defendants the necessary financial information concerning the corporation; but, in any event, the record fails to disclose that any written application for the loan was ever made.

Some difficulties arose because Mr. Hofmann sought the right to write checks upon the corporation's account, but this was rejected by the Leonardos and opposed by Mr. Carlson. The purchasers, however, did receive permission from the Leonardos to open a Seattle office for backhauling freight in otherwise empty L.T.L. trucks to Yakima, which they did for approximately 3 weeks, producing an income thereby of some $1,700.

On February 4, 1971, John Leonardo died and subsequently D. A. Leonardo told Mr. Carlson that everything should be held in abeyance until "things settled down." Soon thereafter, however, it became known to the purchasers that all of the stock of L.T.L. had been sold to Buddy B. Owens for $20,000 plus the assumption by Owens of all corporate indebtedness.

Mr. Carlson testified that he had been in the trucking business for 21 years and had net income from his own trucking business in Seattle of $6,525 in 1970, $9,000 in 1971, and $9,547 in 1972. Mr. Huber testified that he had been in the trucking business for 15 years and at the time of trial was employed as general manager of a trucking company in Seattle. He further testified that his net income from such employment was $11,000 to $12,000 in 1970, $9,737 in 1971, and $14,650 in 1972.

Evidence was also produced from the records of Washington Utilities and Transportation Commission showing that Buddy Owens reported net operating income before taxes, in his operation of L.T.L., of $16,488 in 1971, and $23,252 in 1972.

The trial court granted the defendants' motion for dismissal, made at the end of the plaintiffs' case, and in support of its judgment of dismissal entered, among its findings of fact, the following:

4. That the value of all the capital stock of Leonardo Truck Lines, Inc./or of its assets is not greater than $400,000.00, the purchase price agreed to be paid by the purchasers in the Exhibit 5.

5. That assuming the agreement between the plaintiffs and defendants, dated December 19, 1970 was breached by defendants because of the latter's resale of the corporate stock to Buddy B. Owens on February 22, 1971, the plaintiffs have not shown by any evidence that they could have secured the Small Business Administration Loan pursuant to the terms of the agreement dated December 19, 1970 or could have secured the monies called for under said agreement to pay for said stock.

Based upon its findings, the court entered, among other conclusions of law, the following:

1. That as a matter of law, the plaintiffs failed to prove any damages.

2. That the burden is upon plaintiffs to prove by a preponderance of the evidence that they could have obtained the Small Business Administration Loan called for under the agreement or could have obtained the monies called for under said agreement to pay for the stock.

3. That failing in said proof, the Court finds, as a matter of law, assuming a breach of the agreement between plaintiffs and defendants, that no general or special damages can be causally connected with said breach either by way of loss of profits, loss of bargain, out-of-pocket expenses or general damages.

Issue No. 1: *Did the court err in finding that the corporate stock or the corporate assets did not exceed in value the $400,000 that the purchasers agreed to pay for the stock?*

■ This involves a consideration of "the benefit of the bargain" rule of damages which holds that the injured party to a contract resulting from a breach thereof by the other contracting party is entitled to recover the difference between the actual value of the property purchased and the contract price. This is the usual rule of damages applied in breach of contract actions, which has commonly arisen in situations involving fraud or misrepresentation, where it is expressed as being the difference between the actual value of the property and its value as represented. *Hunt v. Allison*, 77 Wash. 58, 137 P. 322 (1913); *Sherrin v. Gevurtz*, 142 Wash. 128, 252 P. 683 (1927); *Dixon v. MacGillivray*, 29 Wn.2d 30, 185 P.2d 109 (1947); *Salter v. Heiser*, 39 Wn.2d 826, 239 P.2d 327 (1951); *Scroggin v. Worthy*, 51 Wn.2d 119, 316 P.2d 480 (1957).

Thus, under "the benefit of the bargain" rule, the purchaser has proved no damages if he fails to prove that the actual value of the property is greater than the price he contracted to pay. In this case, L.T.L. was actually bankrupt, unable to pay its day-to-day obligations, it was sold

slightly over 2 months after the making of plaintiffs' contract for a substantially lower price than that agreed to be paid by the plaintiffs, and the record is devoid of any evidence fixing its value at or above $400,000. Thus, there was substantial evidence supporting finding of fact No. 4 that the value of all the stock of L.T.L. was no greater than $400,000.

Issue No. 2: *Did the plaintiffs establish, with reasonable certainty, the amount of profits they lost as a result of nonperformance of the contract by the defendants?*

█ The plaintiffs would be entitled to recover, however, if they should establish that they suffered damages which were

(1) . . . within the contemplation of the parties at the time the contract was made, (2) they are the proximate result of defendant's breach, and (3) they are proven with reasonable certainty.

*Larsen v. Walton Plywood Co.,* 65 Wn.2d 1, 15, 390 P.2d 677, 396 P.2d 879 (1964).

In determining whether the evidence in this case is sufficient to establish in the plaintiffs a right to recover for loss of profits, we will assume that the first two elements of the quoted rule have been proved and will consider only the third such element, namely, whether loss of profits have been proved with reasonable certainty.

It has been held by our court that a recovery in damages may be had for loss of prospective profits where the three elements of the rule as quoted above from *Larsen* have been established. Thus, in *Long v. T-H Trucking Co.,* 4 Wn. App. 922, 486 P.2d 300 (1971), recovery was allowed for lost profits where the court found that the defendant had substantially hindered the plaintiff's production of logs, reducing such production from a contemplated 10 truckloads to 3½ truckloads per day, where the price was specified in the contract and where expert testimony established the usual cost of production.

A similar case, *Rathke v. Roberts,* 33 Wn.2d 858, 207 P.2d 716 (1949), held that the plaintiff could recover damages

for loss of profits resulting from the defendant's breach of a contract to purchase from the plaintiff and have him install certain refrigeration equipment, where evidence was produced of the cost of the equipment as well as the cost of its installation, and the contract fixed the amount which the defendant had agreed to pay. The court said, however, at pages 866-67 quoting from *Federal Iron & Brass Bed Co. v. Hock*, 42 Wash. 668, 85 P. 418 (1906):

> The recovery must, of course, be limited to the amount which from all [the] surrounding conditions may be deemed to have been reasonably certain had the breach not occurred.

Recovery was allowed in *Rathke* because definite evidence was produced as to the profit which the plaintiff would have made upon performance of the contract.

On the other hand, our Supreme Court, in numerous cases, has denied recovery for loss of profits where it determined that they had not been proved with reasonable certainty. Thus, in *DeHoney v. Gjarde*, 134 Wash. 647, 236 P. 290 (1925), where damages were sought for loss of profits resulting from the interruption of business of a dancing academy caused by the builder's installation of a leaking roof, the court, in denying recovery, stated at page 667:

> [T]his court is committed to the rule that loss of profits may be recovered, but we have said that the loss must be shown with a reasonable degree of accuracy, and that the testimony establishing the loss must be clear and free from taint of speculation or conjecture.

In *Matzger v. Arcade Bldg. & Realty Co.*, 102 Wash. 423, 173 P. 47 (1918), the court said, at page 429:

> To sustain a verdict for prospective profits, the jury must have some reasonable basis for estimating the worth of the business. From the nature of things, prospective profits cannot be proved to the dollar. Yet the law does demand that there shall be tangible evidence sufficiently clear and convincing to reasonably sustain a verdict.

In *Pappas v. Zerwoodis*, 21 Wn.2d 725, 153 P.2d 170 (1944), a tenant of premises used as a tavern and dance

hall sought damages for alleged loss of profits due to the landlord's breach of a covenant to keep the exterior of the building in good condition. In denying recovery, the court said, at page 733:

[T]he loss must be shown with a reasonable degree of certainty and accuracy, and the proof establishing the loss must be clear and convincing, free from speculation or conjecture.

In *California Eastern Airways, Inc. v. Alaska Airlines, Inc.*, 38 Wn.2d 378, 229 P.2d 540 (1951), the plaintiff leased an airplane to the defendant for 2 weeks. For its own purpose, the defendant installed its own flooring and seats. When the airplane was returned, the plaintiff claimed a balance due on the lease and refused to release the seats. The plaintiff sued for the alleged balance owing on the lease, and the defendant counterclaimed for alleged lost profits while the seats were withheld. The court said, at page 380:

It is not necessary that lost profits be susceptible of exact calculation. It is sufficient if there be data from which the profits can be ascertained with a reasonable degree of certainty and exactness. *Kruegel v. Kitchen*, 33 Wash. 214, 74 Pac. 373; 15 Am. Jur., Damages, 558, § 150; 25 C.J.S. Damages, 516, § 42(a). Thus, it was incumbent upon appellant to prove, preferably by the records of the company, but in any event by competent evidence, and with sufficient certainty to remove it from the realm of speculation, that there were passengers whom it could and would have transported but for want of the seats withheld by respondent, upon which transportation appellant would have made a profit. . . .

. . . It wholly failed to show the number of passenger fares appellant lost for want of the seats in question. Loss of profits, in this case, must be based on loss of business. Appellant, in not showing any such loss, failed in its proof of damages.

In *National School Studios, Inc. v. Superior School Photo Serv., Inc.*, 40 Wn.2d 263, 242 P.2d 756 (1952), which was an action by an employer against a former employee for competing with it in violation of a restrictive covenant in

his contract of employment, the court held that the plaintiff did not prove loss of profits with the required reasonable certainty of proof, where its only evidence thereof was the bare, oral statement of its president that it made a 10 percent profit on the dollar volume of the business obtained by the former employee. The court also held that the trial court properly rejected proffered evidence by the employer showing the net profit made by the former employee from business obtained from former customers of the employer. In so ruling, the court said, at page 276:

> Since no similarity in their respective methods of doing business (other than soliciting) was shown to exist, it was not error for the trial court to sustain respondents' objections to this line of interrogation. In fact, appellant's president testified that its method of developing film and producing pictures was an exclusive process not used by any competitor. Thus, the determination of respondents' net profit would have had no probative value in fixing the amount of appellant's damages.

The only evidence which conceivably could have any tendency to prove the amount of profits which the plaintiffs would have made in the conduct of the L.T.L. business was the testimony that Buddy Owens, the purchaser, reported to the Washington Utilities and Transportation Commission that he had net operating incomes, before taxes, of $16,488 in 1971 and $23,252 in 1972. The record is silent as to Owens' method of operation and as to whether it had any similarity to the method of operation that would have been employed by the plaintiffs. The record is also silent as to the amount of taxes that were payable by Owens upon his operating incomes in the business for the years mentioned. In addition, there is no dispute that the evidence shows that the Leonardos had sustained losses in their operation of the business for several years prior to its sale to Owens.

The evidence showing that the plaintiff Carlson had made profits in 1970, 1971 and 1972 in the trucking business which he owned and operated in Seattle, and that the plaintiff Huber had net incomes during the same years

from a trucking business which he managed for its owner, with no evidence describing such businesses or their methods of operation, and no proof of any similarity of such businesses to the L.T.L. operation, has no tendency to prove that the plaintiffs would have made a profit in L.T.L., or the amount thereof.

We conclude, therefore, that the trial court acted properly in determining that the plaintiffs had failed to establish, with reasonable certainty, that they had suffered a loss of profits, or the amount thereof, because of the defendants' breach of the contract of sale.

Issue No. 3: *Was the trial court correct in determining that the plaintiffs had the burden of proving that they could have secured the $200,000 required for the initial payment on the contract, either by an SBA loan, or otherwise?*

The record contains no evidence that the plaintiffs could have secured an SBA loan of $200,000 by March 31, 1971, as required by the contract, or that such sum could have been obtained from some other source. If such testimony was necessary in order to establish the plaintiffs' right of recovery, the trial court's dismissal of the action was proper, regardless of the other points previously considered herein.

The parties are in disagreement as to whether the plaintiffs were frustrated by the actions of the defendants in the plaintiffs' efforts to secure the financial information concerning the L.T.L. business necessary for a loan application to SBA. It does not appear that the trial court made a factual finding to resolve such dispute. It did hold, however, that the plaintiffs had failed to sustain the burden of proof resting upon them of establishing that they could have obtained the SBA loan of $200,000, or otherwise obtained such funds, by March 31, 1971, the date fixed by the contract for performance.

5 S. Williston, *A Treatise on the Law of Contracts* § 699, at 352-53 (3d ed. W. Jaeger 1961), states the rule as follows:

*If the promisee could not or would not have performed*

*the condition in any event, the manifestation of unwillingness or inability of the promisor to perform will not give rise to a cause of action because the promisee cannot allege and prove that he would have become entitled to receive performance by complying with the condition, had it not been for the promisor's misconduct.*

"Where the buyer repudiates, there is no necessity for the seller to allege a tender, nor his readiness and willingness to perform. *He must, of course, prove that he would have been able to make delivery, for otherwise he will fail in his proof of damages;* . . ."

(Italics ours.) In Restatement of Contracts § 306, comment *a*, (1932), it is stated:

No man is compelled to do a useless act, and if performance of a condition will not be followed by performance of the promise which is conditional, it is useless for the intended purpose and it is therefore unnecessary to perform the condition. A promisee in judging whether performance of a condition will not be followed by performance of the promise is justified in taking the other party at his word. Nevertheless, *if the condition could not or would not have been performed had there been no repudiation of the promise, the promisor is not precluded from asserting the requirement of the condition.* In such a case both parties are free.

(Italics ours.)

In 17 Am. Jur. 2d *Contracts* § 358 (1964), it is said:

A repudiation of a contract before the time for performance arrives dispenses with an offer by the other party to perform, if such repudiation is not withdrawn, although *such other party's readiness and willingness to perform are conditions precedent to liability of the repudiator.*

(Italics ours.)

In *Kane v. Borthwick*, 50 Wash. 8, 12, 96 P. 516 (1908), the court gave expression to the same rule, when it said:

An actual tender of performance may be excused when there is a willingness *and an ability to perform*, and actual performance has been prevented or expressly waived by the parties to whom performance is due. It appears, then, that to excuse a failure to make an actual tender, *there must be an existing capacity to perform,*

coupled with a state of facts which establishes the futility of making the tender."

(Italics ours.)

██ The plaintiffs place reliance upon *Highlands Plaza, Inc. v. Viking Inv. Corp.*, 72 Wn.2d 865, 435 P.2d 669 (1967), but we believe that decision is not controlling, because although it holds that *no tender of performance by the promisee is necessary* to his right to recovery against the promisor who has breached the contract, it does not consider a possible application of the rule that the promisee must establish *his ability to perform* in order to recover damages against a defaulting promisor.

We conclude that the trial court correctly ruled that the plaintiffs had the burden of establishing that they had the ability to make the $200,000 payment due upon the contract by March 31, 1971, a burden which they failed to sustain.

Judgment affirmed.

McINTURFF, C.J., and GREEN, J., concur.