[No. 58401-4-I. Division One. August 20, 2007.]

TMT BEAR CREEK SHOPPING CENTER, INC., *Respondent*, v. PETCO ANIMAL SUPPLIES, INC., ET AL., *Appellants*.

James S. Fitzgerald, Kevin B. Hansen, and John J. White, Jr. (of Livengood Fitzgerald & Alskog, PLLC), for appellants.

Paul R. Taylor and Steven C. Minson (of Byrnes & Keller, LLP), for respondent.

¶1 Dwyer, J. — TMT Bear Creek Shopping Center, Inc., filed this suit against PETCO Animal Supplies, Inc., alleging that PETCO breached a commercial lease agreement between the parties. After PETCO failed to appear or otherwise respond to the summons and complaint, the trial court entered an order of default and default judgment against PETCO. PETCO filed a motion to vacate the default judgment, which the trial court denied. TMT then filed a motion for an award of attorney fees and costs, which the trial court granted.

¶2 PETCO appeals, contending that the trial court abused its discretion in denying PETCO's motion to vacate the default judgment. Specifically, PETCO asserts that in reaching its determination as to whether PETCO had a strong or virtually conclusive defense to TMT's claim sufficient to justify vacation of the default judgment, the trial court erred by evaluating the evidence presented by the parties instead of viewing all such evidence in the light most favorable to PETCO. PETCO also contends that the trial court erred by awarding the total amount of attorney fees and costs requested by TMT. Finding no error, we affirm.

## FACTS

### Underlying Dispute

¶3 PETCO leased commercial retail space from TMT pursuant to a lease set to expire on October 31, 2005. PETCO wished to terminate the lease and vacate the premises a year early. To that end, on July 30, 2004, PETCO entered into a "Lease Termination Agreement" with TMT. Pursuant to this agreement, TMT agreed to release PETCO from the lease on November 1, 2004 and PETCO agreed both to vacate the premises by October 31, 2004 and to pay TMT a "termination fee" of $109,341.55 within 30 days of the execution of the agreement. The record indicates that the amount of the termination fee approximates the amount of rent and other charges PETCO would have paid

over the remaining lease term, not including $31,231.00 owed by PETCO to TMT in past rent.[1]

¶4 PETCO sent payment of the termination fee to TMT on October 7, 2004. In a letter accompanying the check, PETCO stated that the company "might have to stay in the Bear Creek store for a couple of days into November." TMT deposited the check.

¶5 PETCO eventually vacated the premises on November 30, 2004, one month after the date agreed upon by the parties. PETCO asserts that it did not consider the delay to be a problem for TMT, noting that the termination fee covered the cost of rent and additional charges for the remaining lease term.

¶6 TMT asserts, however, that it specifically objected to PETCO remaining in possession of the property. TMT further asserts that, because of PETCO's delay in vacating the premises, a new tenant who was scheduled to take possession of the property on November 1, 2004 was not able to do so and did not start paying rent until six months later, on May 1, 2005.

¶7 In December 2004, TMT contacted PETCO and requested additional rent for November 2004, the month PETCO remained on the premises beyond the agreed-upon date. On December 15, 2004, PETCO sent a check to TMT in the amount of $7,883.86, a lesser amount than that requested by TMT. TMT deposited the check.

¶8 On December 22, 2004, TMT sent a letter to PETCO again requesting the additional rent for November, less the

---

[1] Pursuant to the terms of the lease, PETCO was to pay monthly base rent, yearly "percentage rent" representing a percentage of PETCO's gross sales, and adjustments for common-area maintenance (CAM), taxes, and insurance.

PETCO's "Leasing Administration Director" stated in her declaration that TMT's agent represented to her that he calculated the termination fee as the "net present value due under the remaining term (12 months), including base rent, CAM charges, taxes and insurance." TMT's agent stated in his declaration that

> I understand that PETCO is representing that the Lease Termination Agreement's Termination Fee amounted to the net present value of all monies due under the remaining term of the Lease. This is not accurate. The Termination Fee did not include outstanding Percentage Rents due under the Lease. . . . PETCO's 2002, 2003, and 2004 Percentage Rent totaled $31,231.

$7,833.86 already tendered by PETCO. PETCO did not pay the additional amount requested.

¶9 On July 7, 2005, TMT sent PETCO a letter requesting payment of $109,894.13, representing the additional rent for November 2004; rent for December 2004 through April 2005 (the additional months TMT asserts that it was unable to collect rent from the new tenant as a result of PETCO's failure to timely vacate the premises); unpaid rent from 2002, 2003, and 2004; "adjustment and clean-up charges"; late charges; and attorney fees. The letter further stated that TMT would file suit against PETCO should PETCO fail to make payment within seven days. PETCO did not pay the amount requested.

¶10 On October 6, 2005, TMT filed suit against PETCO, alleging that it suffered damages as a result of PETCO's breach of the termination agreement. TMT served the complaint and a 20-day summons on PETCO's registered agent in Washington. PETCO did not appear or otherwise respond to the 20-day summons. PETCO's general counsel asserts that she received neither the documents nor notice of the dispute.[2]

¶11 On November 17, 2005, TMT filed an amended summons and complaint which named both PETCO and PETCO's parent company as defendants. PETCO served the complaint and a 20-day summons on PETCO's registered agent in Washington on November 18, 2005.[3] PETCO did not appear or otherwise respond to the amended 20-day summons. Again, PETCO's general counsel maintains that

---

[2] However, an employee of the company that handled PETCO's mail at the time, IKON Office Solutions, asserts that IKON's records indicate that it received the summons and complaint from PETCO's registered agent on October 11, 2005 and delivered the documents to the desk of PETCO's general counsel that same day.

Furthermore, after PETCO failed to timely respond, TMT called PETCO, notified an employee of PETCO that the company was in danger of default, and inquired whether PETCO planned on responding to the summons. The employee who answered TMT's telephone call left a message for PETCO's legal department. PETCO did not respond to TMT's inquiry.

[3] PETCO also served the complaint and a 60-day summons PETCO's parent company's registered agent in California.

she received neither the documents nor notice of the dispute.

¶12 The amended complaint and 20-day summons were sent to and received by a legal assistant in the office of PETCO's general counsel. According to PETCO's general counsel, however, that legal assistant did not enter information regarding the documents into PETCO's calendaring system or notify the general counsel of the dispute before leaving that day on an extended holiday.[4] Furthermore, the legal assistant did not subsequently calendar the dispute because she sustained injuries while she was on vacation and, as a result, did not return to work for several weeks. PETCO's general counsel further explains that neither of two temporary workers who were hired to work in the injured employee's stead had entered the information regarding the summons and complaint into PETCO's calendaring system or notified the general counsel of the documents' existence. The general counsel asserts that one such temporary employee was employed for only a short time and, thus, was not trained on the tracking system, and that the other temporary employee was incompetent.

¶13 After PETCO failed to timely respond to the amended 20-day summons, TMT moved the trial court for an order of default. The trial court granted the motion.

¶14 TMT then moved the trial court for entry of a default judgment in the amount of $97,146.26, representing a monthly base rent of $8,155.00 per month for the six months PETCO was unable to rent the premises to the replacement tenant (less the $7,883.86 already tendered by PETCO); $8,136.00 in adjustments (taxes, insurance, and common-area maintenance fees) for those six months; $31,231.00 in outstanding rents for 2002-2004; $8,041.00 in late charges; and $8,692.31 in attorney fees. On December

---

[4] The record reveals that, before she left, the legal assistant e-mailed the summons and complaint to PETCO's Leasing Administration Director. The Leasing Administration Director responded to the e-mail that "all lawsuits need to be handled through the legal department."

21, 2005, the trial court granted the motion, entering judgment in the full amount requested by TMT.

¶15 PETCO received notice of the default judgment in January 2006. On February 28, 2006, after failed attempts to persuade TMT to stipulate to vacation of the default judgment, PETCO filed a motion to vacate. The trial court denied the motion. PETCO filed a subsequent motion for reconsideration, which the trial court also denied.

¶16 On June 1, 2006, TMT moved for an award of attorney fees and costs in the amount of $26,301.91, pursuant to a clause in the parties' original lease authorizing an award of attorney fees and costs to a party prevailing in an action to enforce the lease. The trial court awarded the full amount of attorney fees and costs requested.

¶17 PETCO appeals.

## DISCUSSION

¶18 "We review a trial court's ruling on a motion to vacate a default judgment for an abuse of discretion." *Showalter v. Wild Oats*, 124 Wn. App. 506, 510, 101 P.3d 867 (2004). A trial court abuses its discretion only when its decision is manifestly unreasonable or based on untenable grounds, or for untenable reasons. *Showalter*, 124 Wn. App. at 510. In determining whether to grant a motion to vacate a default judgment, "[t]he trial court must balance the requirement that each party follow procedural rules with a party's interest in a trial on the merits." *Showalter*, 124 Wn. App. at 510; *Griggs v. Averbeck Realty, Inc.*, 92 Wn.2d 576, 581, 599 P.2d 1289 (1979). Hence, although "[d]efault judgments are generally disfavored in Washington based on an overriding policy which prefers that parties resolve disputes on the merits," *Showalter*, 124 Wn. App. at 510, "we also value an organized, responsive, and responsible judicial system where litigants acknowledge the jurisdiction of the court to decide their cases and comply with court rules." *Little v. King*, 160 Wn.2d 696, 703, 161 P.3d 345 (2007).

As our Supreme Court recently noted, "litigation is inherently formal. All parties are burdened by formal time limits and procedures." *Morin v. Burris*, 160 Wn.2d 745, 757, 161 P.3d 956 (2007).

¶19 Our primary concern in reviewing a trial court's decision on a motion to vacate is whether that decision is just and equitable. *Calhoun v. Merritt*, 46 Wn. App. 616, 619, 731 P.2d 1094 (1986). "Justice is not done if hurried defaults are allowed, but neither is it done if continuing delays are permitted." *Johnson v. Cash Store*, 116 Wn. App. 833, 841, 68 P.3d 1099 (2003). "This system is flexible because '[w]hat is just and proper must be determined by the facts of each case, not by a hard and fast rule applicable to all situations regardless of the outcome.'" *Little*, 160 Wn.2d at 703 (alteration in original) (internal quotation marks omitted) (quoting *Griggs*, 92 Wn.2d at 582).

¶20 A party against whom a default judgment has been entered may move for vacation of the default judgmentpursuant to CR 60.[5] Courts have traditionally taken four factors into consideration in determining whether a defendant is entitled to vacation of a default judgment pursuant to that rule. This four-part test was first articulated by our Supreme Court in *White v. Holm*, 73 Wn.2d 348, 352, 438 P.2d 581 (1968):

> The discretion which the trial court is called upon to exercise in passing upon an appropriate application to set aside a

---

[5] CR 60 provides, in relevant part:

**(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud; etc.** On motion or upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:

(1) Mistake, inadvertence, surprise, excusable neglect or irregularity in obtaining a judgment or order;

. . . .

(11) Any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time and . . . not more than 1 year after the judgment, order, or proceeding was entered or taken. . . .

. . . .

**(e) Procedure on Vacation of Judgment.**

(1) *Motion.* Application shall be made by motion filed in the cause stating . . . the facts constituting a defense to the action or proceeding.

default judgment concerns itself with and revolves about two primary and two secondary factors which must be shown by the moving party. These factors are: (1) That there is substantial evidence extant to support, at least prima facie, a defense to the claim asserted by the opposing party; (2) that the moving party's failure to timely appear in the action, and answer the opponent's claim, was occasioned by mistake, inadvertence, surprise or excusable neglect; (3) that the moving party acted with due diligence after notice of entry of the default judgment; and (4) that no substantial hardship will result to the opposing party.

The court in *White* further held that the four elements "vary in dispositive significance as the circumstances of the particular case dictate." *White*, 73 Wn.2d at 352. The court elaborated:

[W]here the moving party is able to demonstrate a strong or virtually conclusive defense to the opponent's claim, scant time will be spent inquiring into the reason as which occasioned entry of the default, provided the moving party is timely with his application and the failure to properly appear in the action in the first instance was not willful. On the other hand, where the moving party is unable to show a strong or conclusive defense, but is able to properly demonstrate a defense that would, prima facie at least, carry a decisive issue to the finder of the facts in a trial on the merits, the reasons for his failure to timely appear in the action before the default will be scrutinized with greater care, as will the seasonability of his application and the element of potential hardship on the opposing party.

*White*, 73 Wn.2d at 352-53. Accordingly, in determining whether a party is entitled to vacation of a default judgment, a trial court's initial inquiry is whether the defendant can demonstrate the existence of a strong or virtually conclusive defense or, alternatively, a prima facie defense to the plaintiff's claims. *See, e.g., Cash Store*, 116 Wn. App. at 841-42. The nature of the trial court's further inquiry depends upon its determination of that question.

¶21 In this case, the trial court first ruled that PETCO was unable to demonstrate the existence of a strong or

virtually conclusive defense to TMT's claim but that PETCO was able to demonstrate the existence of a prima facie defense to that claim. Accordingly, the trial court next inquired into the reasons for the defendant's failure to timely appear, ruling that PETCO's neglect in failing to appear was inexcusable. Thus, the trial court denied PETCO's motion to vacate the default judgment.

## Trial Court's Review of the Evidence

¶22 Initially, PETCO contends that the trial court erred in determining whether the company was able to demonstrate the existence of a strong or virtually conclusive defense to TMT's claims by evaluating all of the evidence proffered by the parties rather than viewing such evidence in the light most favorable to PETCO. We disagree and hold that a trial court may evaluate the evidence presented in determining whether the existence of a strong or virtually conclusive defense has been demonstrated.

¶23 As herein discussed, in determining whether a defendant is entitled to vacation of a default judgment pursuant to the test established in *White*, the court should first inquire whether the defendant has demonstrated the existence of a strong or virtually conclusive defense or, alternatively, the existence of a prima facie defense to the plaintiff's claims. *White*, 73 Wn.2d at 352-53; *see, e.g., Cash Store*, 116 Wn. App. at 841-42.

¶24 In *Pfaff v. State Farm Mutual Automobile Insurance Co.*, 103 Wn. App. 829, 835, 14 P.3d 837 (2000), this court held that, in determining whether there exists evidence to support a prima facie defense, "the trial court must take the evidence, and the reasonable inferences therefrom, in the light most favorable to the movant." *Accord Showalter*, 124 Wn. App. at 512. In other words, the defendant satisfies its burden of demonstrating the existence of a prima facie defense if it is able to produce evidence which, if later believed by the trier of fact, would constitute a defense to the claims presented. *Pfaff*, 103 Wn. App. at 835-36.

The court does not act as a trier of fact in making such a determination and may not conclusively determine which party's facts control. *Showalter*, 124 Wn. App. at 512.

¶25 The *Pfaff* rule is a sensible one. The purpose of requiring a defendant moving for vacation of a default judgment to demonstrate the existence of a prima facie defense is to avoid a useless trial. *Griggs*, 92 Wn.2d at 583. Were a defendant able to obtain vacation of a default judgment even where it had no defense to the claims asserted against it, the resulting trial would simply result in another judgment in favor of the plaintiff. *Pfaff*, 103 Wn. App. at 834. In determining whether a trial would be useful, the trial court need determine only whether the defendant is able to demonstrate any set of circumstances that would, if believed, entitle the defendant to relief. The most reasonable method by which to conduct this inquiry isto view the facts proffered in the light most favorable to the defendant, assuming the truth of that evidence favorable to the defendant and disregarding inconsistent or unfavorable evidence.

¶26 Despite PETCO's contention to the contrary, however, neither *Pfaff* nor any subsequent decision holds that the trial court must view the evidence in the light most favorable to the defendant when determining whether the defendant is able to demonstrate the existence of a strong or virtually conclusive defense to the plaintiff's claims. Such a rule would not be sensible.

¶27 As a starting point, it is readily apparent that were a trial court required to view the evidence in the light most favorable to the movant both in determining the existence of a strong or virtually conclusive defense and in determining the existence of a prima facie defense, there would be no reasonable distinction between the two inquiries. Viewed in such a light, evidence sufficient to demonstrate the existence of a prima facie defense would also, of necessity, demonstrate the existence of a strong or virtually conclu-

sive defense as well.[6] We do not read the rule articulated in *White* to indicate that our Supreme Court intended such a state of affairs.

¶28 Moreover, the rationale for viewing the evidence in the light most favorable to the movant in determining the existence of a prima facie defense is inapplicable to a determination of whether there exists a strong or virtually conclusive defense to the plaintiff's claim.

¶29 As previously discussed, the purpose of requiring the defendant to demonstrate the existence of a prima facie defense is simply to avoid a useless subsequent trial. *Griggs*, 92 Wn.2d at 583. If a defendant is able to proffer evidence which, if proved, would entitle that defendant to relief, a trial on the merits would be useful to determine the truth of the factual evidence proffered by the defendant regardless of the existence of countervailing evidence. It is for this reason that the evidence is viewed in the light most favorable to the defendant in conducting that inquiry.

¶30 In contrast, the purpose of determining whether there exists a strong or virtually conclusive defense is not to

---

[6] This point may be illustrated by way of the following hypothetical situation. Pursuant to a motion to vacate a default judgment on a breach of contract claim, we may assume that the evidence before the trial court consists of nine declarations proffered by the plaintiff, all asserting that the defendant failed to perform a duty imposed by the contract at issue, and one declaration proffered by the defendant, asserting that the defendant had complied with that duty.

In determining whether the defendant can demonstrate the existence of a prima facie defense, the trial court properly views all the evidence before it in the light most favorable to the defendant and, therefore, relies upon evidence favorable to the defendant while disregarding evidence that is unfavorable or inconsistent with that evidence. Thus, in our example, the trial court properly assumes the truth of the evidence contained in the single declaration favorable to the defendant and disregards the nine declarations containing inconsistent evidence. That single favorable declaration is sufficient to demonstrate the existence of a prima facie defense because the facts set forth therein, if later believed by the trier of fact, would entitle the defendant to relief.

If the trial court were similarly required to view the evidence in the light most favorable to the defendant in determining the existence of a strong or virtually conclusive defense, the trial court would similarly rely only upon the declaration containing that evidence favorable to the defendant rather than evaluating all of the evidence before it. Assuming the truth of that declaration, the trial court would then be compelled to find that the defendant also had a strong or virtually conclusive defense to the plaintiff's claim, despite the nine declarations that, if considered, would suggest otherwise.

avoid a useless subsequent trial but, rather, to serve principles of equity. *See Cash Store*, 116 Wn. App. at 841 ("In determining whether a default judgment should be vacated, the court applies equitable principles to ensure that substantial rights are preserved and justice is done."). If a default judgment on a meritless claim is allowed to stand, justice has not been done.[7]

¶31 The basis for the existence of two different inquiries ("strong or virtually conclusive defense" vs. "prima facie defense") lies in the different purposes they serve. As discussed:

> If a "strong or virtually conclusive defense" is demonstrated, the court will spend little time inquiring into the reasons for the failure to appear and answer, provided the moving party timely moved to vacate and the failure to appear was not willful. *White*, 73 Wn.2d at 352; *Shepard Ambulance, Inc. v. Helsell, Fetterman, Martin, Todd & Hokanson*, 95 Wn. App. 231, 242, 974 P.2d 1275 (1999). However, when the moving party's evidence supports no more than a prima facie defense, the reasons for the failure to timely appear will be scrutinized with greater care. *White*, 73 Wn.2d at 352-53.

*Cash Store*, 116 Wn. App. at 841-42. Where the party in default finds itself in that position as the result of excusable neglect, mistake, surprise, or inadvertence, it is most likely equitable to grant that party relief, provided, however, that a trial would not be a useless exercise. Hence, the "prima facie defense" inquiry.

¶32 On the other hand, where the party in default finds itself in that position as a result of *inexcusable* circumstances, equity necessitates that the bar be set higher. Hence, the "strong or virtually conclusive defense" inquiry. Supporting this analysis is the proposition that where the

---

[7] In the federal courts as well, a party may maintain an independent action in equity to vacate a default judgment when it can show that the judgment is "manifestly unconscionable." *See, e.g., Pickford v. Talbott*, 225 U.S. 651, 657-58, 32 S. Ct. 687, 56 L. Ed. 1240 (1912). Such a situation might exist, for example, when the judgment was obtained as a result of a document that had been forged by the opposing party. *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 250, 64 S. Ct. 997, 88 L. Ed. 1250 (1944).

defaulting party's actions are deemed willful, equity will not afford that party relief, even if the party has a strong or virtually conclusive defense to its opponents' claims. *See White*, 73 Wn.2d at 352.

¶33 Thus, the two different inquiries are the products of two different concerns. Where the actions resulting in default are excusable, vacating a default judgment and allowing for trial is likely an equitable result, unless the trial would be a useless formality. However, where the actions resulting in default do not qualify as excusable, the concern is different. Hence, trial would not be warranted unless allowing a judgment to stand would itself be an inequitable result because of the existence of a conclusive defense to the claim. Even in the latter situation, however, equity will not allow for vacation of the judgment if the actions leading to default were willful. Willful defiance of the court's authority can never be rewarded in an equitable proceeding.

¶34 When engaging in the inquiry as to the existence of a "strong or virtually conclusive defense," the court is exercising its equitable authority. The exercise of equitable powers is not a ritualistic enterprise. A trial court called upon to exercise its equitable powers may develop reasonable procedures by which to do so. *See Grismer v. Merger Mines Corp.*, 43 F. Supp. 990, 994 (E.D. Wash. 1942) (In equity, "[t]he novelty of the problem will not prevent the court from acting and the court may suit proceedings and remedies to circumstances of cases."); *Coy v. Raabe*, 77 Wn.2d 322, 326, 462 P.2d 214 (1969) ("In any equitable proceeding, the trial court has certain inherent discretion."); *Rummens v. Guaranty Trust Co.*, 199 Wash. 337, 347, 92 P.2d 228 (1939) (equity allows trial court to develop reasonable procedures where procedures are inadequate to ensure substantive rights); *Blanchard v. Golden Age Brewing Co.*, 188 Wash. 396, 418, 63 P.2d 397 (1936) (equity jurisdiction gives rise to inherent authority of court to determine what steps must be taken in the process of a judicial inquiry).

¶35 The trial court did not err by evaluating all of the evidence presented by the parties, rather than viewing such evidence solely in the light most favorable to PETCO, in determining whether PETCO was able to demonstrate the existence of a strong or virtually conclusive defense to TMT's claim.

## Strong or Virtually Conclusive Defense

¶36 PETCO next contends the trial court erred by determining that PETCO had failed to demonstrate the existence of a strong or virtually conclusive defense sufficient to justify vacation of the default judgment. We disagree.

¶37 Again, as the court in *White* explained, a trial court may grant vacation of a default judgment when (1) the movant is able to demonstrate that it has a strong or virtually conclusive defense to the claim asserted against it, (2) the movant has timely moved to vacate the default judgment, and (3) the movant's failure to timely appear was not willful. *White*, 73 Wn.2d at 352-53; *Showalter*, 124 Wn. App. at 512.

### Waiver

¶38 PETCO's first asserted defense is that TMT waived the termination agreement's condition that PETCO vacate the leased premises by October 31, 2004.

¶39 "Waiver" is defined as an "intentional relinquishment of a known right" and requires "unequivocal acts or conduct evincing an intent to waive." *Wagner v. Wagner*, 95 Wn.2d 94, 102, 621 P.2d 1279 (1980). Intent will not be inferred from doubtful or ambiguous facts. *Wagner*, 95 Wn.2d at 102.

¶40 PETCO initially contends that TMT waived the condition by accepting and retaining the termination fee check. In support of its assertion, PETCO relies on *Restatement (Second) of Contracts* § 246(1) (1981), which states:

[A]n obligor's acceptance or his retention for an unreasonable time of the obligee's performance, with knowledge of or reason

to know of the non-occurrence of a condition of the obligor's duty, operates as a promise to perform in spite of that non-occurrence.

That section, however, concerns the circumstances in which a party's retention of performance or part-performance operates as a promise to perform in spite of the other party's defective performance. It does not state that such retention operates as a waiver of either the breaching party's duty to fully perform or the right to seek damages arising from the breaching party's defective performance. Indeed, comment b to that section states:

> [I]t does not follow from one party's mere voluntary receipt of performance that the other party's defective performance has discharged his own duty . . . . Therefore, . . . he is liable for damages for partial breach because of his defective performance.

RESTATEMENT (SECOND) OF CONTRACTS § 246 cmt. b. PETCO's contention is unavailing.

¶41 PETCO also asserts that TMT waived the condition by failing to object to PETCO remaining on the premises beyond the agreed-upon date. However, there was conflicting evidence before the trial court as to whether TMT made such a specific objection. As herein discussed, the trial court was entitled to consider all such evidence in determining whether PETCO's assertion that TMT intentionally waived its right to enforce the move-out condition against PETCO constituted a strong or virtually conclusive defense to TMT's claim.

¶42 Furthermore, "[m]ere silence does not constitute a waiver unless there is an obligation to speak." *Voelker v. Joseph*, 62 Wn.2d 429, 435, 383 P.2d 301 (1963). Thus, even if TMT acquiesced in PETCO's breach by not clearly objecting to PETCO remaining on the premises beyond the agreed-upon date, the trial court was justified in determining that such silence was not sufficient to amount to an intentional relinquishment of TMT's right to obtain full performance or to seek damages as a result of PETCO's breach.

¶43 The trial court did not abuse its discretion by determining that PETCO's asserted waiver defense was not strong or virtually conclusive.

*Material Breach*

¶44 PETCO's next asserted defense to TMT's claim is that PETCO's breach of the termination agreement was not material.

 ¶45 Whether a breach is material is a question of fact, and the trial court may consider, among other factors, the extent to which the injured party will be deprived of a benefit which he reasonably expected. *Bailie Commc'ns, Ltd. v. Trend Bus. Sys.*, 53 Wn. App. 77, 83, 765 P.2d 339 (1988) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981)).[8]

¶46 PETCO contends that TMT was not deprived of any benefit, asserting that it received everything it bargained for, i.e., the rent PETCO would have paid over the remaining term of the lease. This contention fails. Even assuming that the termination fee represented the total rent PETCO would have paid over the remaining lease term had the lease remained in effect, such was not the only benefit bargained for by TMT pursuant to the termination agreement. In return for both releasing PETCO from the lease and forgiving PETCO the approximately $30,000 in outstanding rental amounts due, TMT bargained for the opportunity to obtain additional rent from a replacement tenant beginning on November 1, 2004. Despite PETCO's

---

[8] Other factors the court may consider are:

 (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

 (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

 (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

 (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

RESTATEMENT (SECOND) OF CONTRACTS § 241.

contention to the contrary, the possibility of such rental amounts did not represent a potential "windfall" to TMT but, rather, a benefit for which TMT bargained. TMT was deprived of that benefit for the six months it was unable to let the premises to the new tenant as a result of PETCO's breach.

¶47 Moreover, even assuming that PETCO's breach was not material, a breach need not be material to give rise to a cause of action for damages. Any failure to perform a contractual duty constitutes a breach, RESTATEMENT (SECOND) OF CONTRACTS § 235(2) (1981), and an injured party is generally entitled to those damages necessary to put that party in the same economic position it would have occupied had the breach not occurred. *Rathke v. Roberts*, 33 Wn.2d 858, 865-66, 207 P.2d 716 (1949).

¶48 The trial court did not err by determining that this argument did not constitute a strong or virtually conclusive defense to TMT's claim.[9]

*Setoff*

¶49 PETCO's final assertion in support of its proposition that it has a strong or virtually conclusive defense to TMT's claims is that even if it materially breached the termination agreement, it is entitled to a setoff of the entire $109,345.11 it paid TMT as a termination fee.

¶50 PETCO's assertion that it is entitled to such a setoff appears to be premised on the assumption that TMT sought, by bringing the claim here at issue, to recover that which it would have received had the termination agree-

---

[9] PETCO also contends that even if it breached the termination agreement, it cured the breach within a reasonable period of time. The sources PETCO relies upon stand for the proposition that so long as a breach is cured within a reasonable period of time, the injured party may not suspend its own performance of the contract, rescind the contract, or sue for total breach of the contract. *See Bailie Commc'ns*, 53 Wn. App. at 81 (citing RESTATEMENT (SECOND) OF CONTRACTS §§ 242, 243, 373 (1981)). Those sources do not, however, stand for the proposition that late performance of a condition precludes an injured party from suing for the damages caused by such a defective performance. Thus, the trial court did not err by finding that PETCO's contention that it cured the breach does not constitute a strong or affirmative defense to TMT's claim.

ment never been entered into: the full amount of rent PETCO would have paid over the remaining lease term. Accordingly, PETCO asserts that both the termination fee and the damages sought by TMT represented the rent PETCO would have paid had the lease remained in effect and that by allowing TMT to obtain such damages in addition to its retention of the termination fee, the trial court allowed TMT to obtain double the amount of recovery to which it is entitled. However, PETCO's assumption that the damages TMT sought represented the rents PETCO would have paid had the lease remained in effect is not supported by the record.

¶51 Again, the general rule governing breach of contract damages is that such damages should be in an amount sufficient to place the injured party in the same economic position it would have occupied had the contract been fully performed. *Rathke*, 33 Wn.2d at 865-66. The record here reveals that the damages primarily sought by TMT constitute compensatory amounts. If PETCO had fully performed the termination agreement by timely vacating the premises, TMT would have been benefited *both* by the receipt of the termination fee *and* by the rent and other charges it would have received from the new tenant during the six months the property either sat vacant or was occupied by PETCO in violation of the termination agreement. The majority of the damages sought by TMT represent the rents and additional charges it would have received for those six months had PETCO timely vacated the premises. Accordingly, the trial court did not abuse its discretion by determining that PETCO's argument that it is entitled to a setoff representing the full amount of the termination fee did not constitute a strong or virtually conclusive defense to TMT's claim.[10]

---

[10] We note that PETCO may have been able to demonstrate a strong or virtually conclusive defense to any portion of the damage award that may have been unnecessary to put TMT in the same position it would have occupied had PETCO not breached it obligation under the termination agreement. For example, PETCO may have been able to raise such a defense to that portion of the award representing 2002-2004 outstanding rental amounts. Courts have occasionally

¶52 The trial court did not abuse its discretion by determining that none of the defenses asserted by PETCO constituted a strong or virtually conclusive defense sufficient to justify vacation of the default judgment.

### Excusable Neglect

¶53 PETCO next contends that the trial court abused its discretion by ruling that PETCO's failure to timely appear was not the result of excusable neglect. We disagree.

¶54 Again, as the court in *White* explained, when a defendant is not able to demonstrate the existence of a strong or virtually conclusive defense, the defendant may nonetheless be entitled to vacation of a default judgment pursuant to CR 60(b) if it can show

> (1) That there is substantial evidence extant to support, at least prima facie, a defense to the claim asserted by the opposing party; (2) that the moving party's failure to timely appear . . . was occasioned by *mistake, inadvertence, surprise or excusable neglect*; (3) that the moving party acted with due diligence after notice of entry of the default judgment; and (4) that no substantial hardship will result to the opposing party.

*White*, 73 Wn.2d at 352 (emphasis added).

¶55 Judicial decisions have repeatedly held that if a company's failure to respond to a properly served summons and complaint was due to a breakdown of internal office procedure, the failure was not excusable.

> If a company fails to respond to a complaint because someone other than general counsel accepted service of process and then

---

held that a defendant may obtain vacation of the damages portion of a default judgment when it has demonstrated a defense only to a portion of the damages awarded. *See, e.g., Shepard Ambulance*, 95 Wn. App. 231 (determining existence of prima facie defense).

However, the burden is on the moving party to demonstrate the existence of a strong or virtually conclusive defense, not on a trial court to discern it. *White*, 73 Wn.2d at 352. Accordingly, given that PETCO did not raise this issue in the trial court, the issue does not afford PETCO a basis for appellate relief.

neglected to forward the complaint, the company's failure to respond is deemed due to inexcusable neglect.

*Cash Store*, 116 Wn. App. at 848; *see also Beckman v. Dep't of Soc. & Health Servs.*, 102 Wn. App. 687, 11 P.3d 313 (2000) (neglect in failing to institute office management procedures to "catch" administrative errors was inexcusable); *Prest v. Am. Bankers Life Assurance Co.*, 79 Wn. App. 93, 900 P.2d 595 (1995) (neglect inexcusable when summons and complaint were "mislaid" while general counsel was out of town).

¶56 In this case, PETCO failed to ensure that the legal assistant responsible for entering the deadline into the calendaring system did so before she left on an extended vacation, subsequently failed to ensure that employees hired to replace that assistant were trained on the calendaring system and competent in operating it, and failed to institute any other procedures necessary to ensure that PETCO's general counsel received notice of the dispute. PETCO's neglect was due to a breakdown in internal office management and procedure and was, therefore, inexcusable.[11]

¶57 Accordingly, the trial court did not abuse its discretion by ruling that PETCO's failure to answer was due to inexcusable neglect and that PETCO was not entitled to vacation of the default judgment on this basis.

*Attorney Fees in Trial Court*

¶58 Finally, PETCO contends that the trial court abused its discretion by awarding the full amount of attorney fees requested by TMT. We disagree.

---

[11] PETCO's citation to *Showalter*, 124 Wn. App. at 514, does not convince us otherwise. In that case, the court found that the trial court did not abuse its discretion by vacating a default judgment on the basis of excusable neglect when the failure to respond was due to defective office communication. Here, the failings at issue were more egregious than those at issue in *Showalter* and involved more than the single omission at issue in that case. Moreover, the court's decision finding that the trial court did not abuse its discretion does not necessarily indicate that the trial court would have abused its discretion by denying a motion to vacate under similar circumstances, a situation more akin to the one at issue here.

¶59 An award of attorney fees is proper when authorized by the parties' agreement, by statute, or by a recognized ground in equity. *State v. Keeney*, 112 Wn.2d 140, 142, 769 P.2d 295 (1989). Here, the trial court based its award of attorney fees on a clause in the original lease. PETCO does not challenge the trial court's determination that the clause supported an award of attorney fees. PETCO contends, however, that the amount of the fees awarded to TMT was unreasonable.

¶60 The amount of an award of reasonable attorney fees is a matter within the trial court's discretion. *Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 65, 738 P.2d 665 (1987). A trial court abuses its discretion only when its decision is manifestly unreasonable, or when its discretion is exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). A trial court properly determines a reasonable fee by calculating a lodestar figure, which is the market value of the attorney's services determined by multiplying the hours reasonably expended in the litigation by the reasonable rate of compensation. *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 593, 675 P.2d 193 (1983); *Perry v. Costco Wholesale, Inc.*, 123 Wn. App. 783, 808, 98 P.3d 1264 (2004). Here, the trial court based its determination of a reasonable attorney fee award on its application of a lodestar figure and articulated reasonable reasons for so doing.[12]

¶61 The trial court did not abuse its discretion by awarding the full amount of attorney fees requested by TMT.

*Attorney Fees on Appeal*

¶62 Both parties request an award of attorney fees on appeal pursuant to RAP 18.1 and the clause contained in

---

[12] "The court finds that the requested attorney fees are based upon reasonable rates and, applying the lodestar methodology to a review of the billing records supplied in support of the motions, the fees incurred are reasonably related to the Defendants' motion to set aside default and were necessarily incurred."

the original lease. As the prevailing party on appeal, TMT is entitled to an award of those fees reasonably incurred in defending against PETCO's claims before this court. TMT may submit an application for such an award to our commissioner pursuant to RAP 18.1(f). Our commissioner will make the appropriate award. PETCO's request for an award of attorney fees on appeal is denied.

¶63 Affirmed.

COLEMAN and ELLINGTON, JJ., concur.